Good morning, Your Honors. I'm Gary Finn. I represent the petitioner, Eginia Martinez de Bajorquez. Your Honors, the immigration statutes only provide two ways, and only two ways, for an immigration judge's deportation order to become an administratively final order. The first way is if the Board of Immigration Appeals affirms the case on the merits and affirms the deportation order. And the second way is if the non-citizen fails to take an appeal within 30 days of the immigration judge's decision. There's nothing else in the statutes that provide any other way for an order to become final. So when my client traveled to Mexico for dental treatment or medical treatment while her appeal was pending, she was still a permanent resident under the statutes. She had every right to travel to Mexico. She was subject to a deportation order. From an immigration judge. That's correct. And she was on appeal. She was subject to a deportation order. And she traveled for three years, once a month, sometimes every 15 days, dental service, visiting family, it's all on the record. So it wasn't just a casual deal. She was behaving like any ordinary person would. I can go to Mexico. I have family. I go down and do my medical. And she just lived her life like she had to live, right? The only problem is she was subject to a deportation order. And then we get in problems because of the regulation was 3.4. Right. Right. I mean, I'm sympathetic to this, but it's sort of like a catch-22. Every time you turn a corner, you run into a problem. And I'm not too sure I understand the significance of her trips back and forth to Mexico. I'm not too sure I understand what happens when she goes across the border. And if you apply 3.4, that now the deportation becomes final. I don't understand the fact that she was caught in the United States as violating her. And after this final deportation versus being caught at the border, not coming in. Can you help? Can you walk me through all that? Is there a simple answer to this? Well, there might be a simple answer, and it's the problem, really, in the case, I think. The problem is that my client was never warned that by leaving the country she would be, at least under the regulation, that she would be abandoning her appeal and giving up her right to be a legal resident. Now, is that a basis in law, constitutional law? What's the claim there and how does it fit into where we are now, the failure to warn? Well, the failure to warn is interesting because I'm not aware of any other area of the law. Of course, I only practice immigration law. But I'm not aware of any other area of law where a person can relinquish their right to appeal without doing it knowingly, without doing it voluntarily. Relinquish their right to appeal. See, this is the trouble with 3.4. It's been in existence forever. I mean, I don't know what, 30 years or whatever. It says that if you're under a deportation order and it's on appeal and if you leave the country, you've executed the deportation order. Now, right or wrong, that's what's being argued here. And that's when I get in trouble because then I'm trying to sort out how that all fits within the existing status of the law. We've had so many changes in the immigration law, it's hard to get through this. You're saying it's keyed on notice to her that she didn't have the notice that by doing so she would have forfeited her appeal rights. Right. In effect, because they said your deportation is final. Right. And the government's answering brief, one of the arguments that the government makes is that it was a waiver of the right to appeal. And, of course, I would argue that there can't be a waiver of the right to appeal if it's not done knowingly and voluntarily. Well, you can really get tangled up in this. Let's assume that 3.4 applies and that now she's executed the deportation order. So now she's deported and because in the United States she's subject to some exclusionary rules where she can now try to somehow get back the right to the appeal because I get lost at that point because I don't even know how to analyze it other than the fact that what the government is arguing, 3.4, you're deported, it's all over. I mean, that's what I hear anyway. Well, that's what the government's arguing. And what I'm arguing is that that regulation is ultra-virus. It's not in the statute and it violates my client's rights to due process. You know, I should also point out this Court has held in other cases that 3.4 applies. It did so in a case called Blaze, which is cited by the government. But I would point out that in that case apparently the alien was not a permanent resident and had left the country and tried to come back using a bogus passport. My client, when she made these trips to Mexico, she still had her green card. She had her alien registration card. It had never been taken away from her. And she never knew that by leaving the country that she would be giving up her appeal. And the system didn't have any screen to say, uh-oh, you got a green card, but you're subject to deportation. You're just executed, bye-bye. So she, as I said, she went about her business as if, you know, everything was just fine and she's on appeal. Is this the first case that's going to test 3.4 in the manner that we have here where, if I remember right, it's five years since the deportation order before this is resolved and gets to a court. And three of those years she functioned back and forth into Mexico. So that issue is there. Is this the first case that puts that all together? Well, the government submitted supplemental authority, a supplemental citation just three days ago. I think I got it on Wednesday. It's a case called Aguilera Ruiz, and it was decided by another panel. Counsel, that case, the mandate has not gone down, and the government has been ordered to respond to the petition for rehearing. Right. And when I got the supplemental citation, I looked into that and I'm aware of that. And I don't know, I guess I'll reserve the balance of my time, but maybe the court wants to hold this case in abeyance and see what happens in the other case. We can ask counsel what they feel about that. You're somewhat different in that you're challenging the constitutionality of 3.4. Right. And that was not challenged in the other case. Yeah, I don't believe that there was an equal protection argument raised in the other case, as far as I can tell. Well, at least from the opinion, it did not. In my case, I tried to raise an equal protection argument because if my client had been in exclusion proceedings and not deportation, then there's no regulation. That's what I'm saying. I don't see that I can find any law out there where you are. You're in a very unique position with regard to 3.4. And it's very confusing because of the changes in the law. I think this is a unique case. I'm not sure, but that's my feeling. I think it is, too. Okay. I'll reserve the balance of my time. Thank you. Okay. Good morning, Your Honors. My name is Jackie Dryden, and I represent the Attorney General of the United States of America. I first want to address your concern about the Aguilera-Ruiz case. The government has until the 24th to answer in that proceeding. They asked for an extension of time, so we're just going to go ahead. Thank you. I wasn't aware of that, Your Honor. I appreciate you informing me of that. To the extent that the reasoning in Aguilera-Ruiz applies to Ms. de Borja's case, the government submits that Mr. Aguilera-Ruiz was a lawful permanent resident who left the United States to go to Mexico, from what I can tell, maybe only on one occasion. The petitioner in this case left to go to Mexico innumerable times. I see three years, at least once a month, sometimes every 15 days, but that's the whole point. The immigration law has been changed so many times, you don't know where you fit. And what I find is that she had a green card, never taken away from her. And she used that green card and the privilege and the rights that she had under the green card to conduct her life, while five years goes by while the INS does nothing. Okay? She filed her appeal, five years go by. She has to get medical treatment. She goes home to see her family. So now she's back across the border. Nobody stopped her at the border. What would have happened if somebody stopped her at the border? Would we have a different case? That's his due process argument. And it gets so confusing from there. I don't think there's a case anywhere out there exactly like this case, because merely the fact that she had a deportation order but had the green card, which they don't put a badge on it and say don't use this. What are the rights under that green card subject to deportation and does 3.4 somehow violate those rights? If I may address your question regarding the equal protection. You can address any of it because I'm totally confused. Go ahead. Well, I want to address your equal protection concern first. If Ms. Deborah, his client, had been picked up at international border and with the same conduct bringing over her cousin over that border, she would have been susceptible to be in place in exclusion proceedings. There was a provision for smuggling. And conceivably, she could have been caught under that provision and been excluded from the United States. That would have put her in the exclusion proceedings. She would not at that point, she would not have been admitted into the United States because of her conduct. They might have been. Would they have paroled her in but kept her in exclusion proceedings? It's kind of crazy, but I think that's what they do. They might, but they didn't have to. They could have kept her outside the international border. I mean, that's hypothetically, Mr. Finn raised that in his brief, but it doesn't necessarily mean that they would have paroled her into the United States. But that brings you to the next step. So what? Isn't this about 212C? It is about 212C. Because she has American children. She's been here I don't know how many years, and she's got all these citizens' rights in this family. All that's interesting and that's what I'm griped about, about the changes in the law. So what? The issue is what happened to her as a result of the way she was caught or what happened. I'm not arguing any quarreling about the smuggling. I'm saying what happens next. Is this about 212C? Your Honor, it's much larger than 212C. That is a part of this case. Well, if she gets to 212C, do you think she might be able to stay here? Your Honor, from my review of the record, his client has violated several immigration laws, more than just illegally entering the United States or that one smuggling. There's evidence in the record. Well, didn't the I.J. say he would have granted it except for her having abandoned her appeal? Yes, Your Honor, he did. He said as a matter of discretion, he would have granted that relief. Isn't that the whole point of this case? And see, all this other stuff gets me confused, because if she can get 212 release or relief ---- But, Your Honor, okay, assuming she would have been ---- let's assume she was in exclusion proceedings, which would not have barred her from eligibility for 212C. Exactly. Exactly. However, she would have had the burden of proving that she was admissible into the United States. And because of her smuggling charge, she could not have overcome that burden. She admitted to smuggling her cousin. Is that disposed, then, of the due process argument? I would say yes, Your Honor. It takes care of it, because had she been caught at the border, placed in exclusion proceedings, it would have been her burden to prove that she was admissible into coming into the United States. The language under which she was charged in the OSC is the same language for being inadmissible. And the evidence showed, from the Border Patrol's testimony, the INS records, her subsequent testimony at her May 1998 hearing, that she did, in fact, know that her cousin was not a U.S. citizen, and that she assisted in her travels north in the United States. Well, later on, somewhere, didn't she change that position? That she? Yeah. No. Initially, at her 1993 hearing, she disavowed of knowing that her cousin was not a U.S. citizen. It was at her May 1998 hearing, where she was discussing the eligibility for 212C, that the immigration judge said, to become eligible, you need to show me some sort of rehabilitation. And she's like, okay, Your Honor, I know that my cousin was not a U.S.C. when I was doing this conduct. So at that point, she admitted that her cousin was not a U.S.C., and that she had that knowledge at the time that she was assisting her north in her travels. Well, her appeal, which may or may not have reconciled this, was now cut off because of 3.4. Yes, Your Honor. So now, if we go along this road again, this convoluted road, we're at 3.4. And as I understand your answer, 3.4 is a valid exercise by the agency. Absolutely. And so, if the agency has been around forever, and the moment she crossed the border – and in this one, I don't think it's just one time. I mean, I think the record is she's admitted she went across three years. Then that means that she executed the deportation order. Yes, Your Honor. And therefore, she's lost her appeal. Yes, Your Honor. And that's the end of the case. That is the end of the case, Your Honor. That's where we should start and stop. In the context of voluntary departure, we require that the agency requires that you tell the individual all of the consequences of not departing on time. Why isn't there some kind of notice requirement here to tell the individual, look, now, if you cross the border, you lose your right to pursue your appeal? Your Honor, the immigration laws are fraught with consequences if aliens don't attempt to comply with them. And the – Well, why do we require this elaborate notice in one situation and not in the other? Your Honor, this is a situation in which involuntary departure, a person is being granted a form of relief. So that way the adverse consequences don't accrue in the future. In this situation, Ms. – Mr. Finn's client was ordered – deported from the United States. She had a final – she had an order of deportation from the immigration judge. There was nothing more for her to do. She was not eligible for relief. Her only – Well, she had an appeal going. She did have an appeal to the board. But to the extent that, you know, my colleague, as he briefed in the – included in his brief, this is a longstanding regulation. It has been around for years. Three – four courts prior to this court in Aguilera Ruiz recognized that 3.4 existed and that it applied for aliens who left the United States that their appeal would be withdrawn. Is there any case that where 3.4 has been applied to a permanent resident with a green card, subject to a deportation order that has not yet been reviewed by the BIA? That has not been. That's your facts. I think that is my facts, Your Honor. See, I understand 3.4. But what I don't understand is what we do when we give somebody a green card, tell them they're a permanent resident and they try to exercise, which I would hope, they have certain rights and privileges with that green card, and then they run into 3.4 before the order of deportation has been reviewed. And she didn't withdraw her. She sat around for five years waiting for them to do something. She had to get on with her life. And so she did with the green card. And nobody took it away from her. Nobody said, Don't come across the border. We've got a hold on you. Well, Your Honor, she did have an attorney who presumably would have given her her warnings if he was. Well, you can't make that assumption in this field. What would he have told her about 3.4 if there's no law? He would have said it will be absolutely applied against you because even though we haven't reviewed your deportation order, you're going to execute your deportation by going across the border. Stay here. That's exactly what he should have said. And is there any law interpreting that position of 3.4 under these circumstances? In Alimen, the Alimen Fierro in the Fifth Circuit, the alien was a citizen of Mexico, was a citizen of Mexico and admitted into the United States as a lawful permanent resident. And he also went into Mexico to visit his wife on one occasion. He was admitted how? It says as a permanent resident alien in 1964. So I would assume he had a green card. Yes. It's the same facts. What's the name of the case again? Is that in your brief? Yes, Your Honor, it is. What is it? The site is 481 Federal 2nd, 601. And what's the name? Alimen, A-L-E-M-A-N hyphen Fierro, F-I-E-R-O. Okay. I have two questions. One is regarding the I-N-S-N. Can I have two, 30 seconds, please? Go ahead. I do want to, regarding this Court's jurisdiction, it doesn't have jurisdiction to review her underlying deportation order, because according to 106C, once the client departed the United States and this Court was without jurisdiction to review the underlying deportation order. With regard to Mr. Finn's claim that this is an ultra-virus regulation, in this Court's decision in Aguilera v. Ruiz, the Court noted that the Attorney General does have discretion to promulgate regulations such as this, and in fact noted that in this case the regulation was appropriate. And that is all, Your Honors. Thank you very much. Thank you. Rebuttal. Well, I think I can answer Judge Brunetti's question about the exclusion proceedings. If my client had been detained at the border, she would have been paroled in, as Judge Fletcher suggested. They give a parole document, and she would have gone on with her life pretty much the same way she would have with it being in deportation proceedings, but she would have been in exclusion proceedings. Had she then left again to Mexico for medical treatment, she would not have withdrawn her appeal. Well, I just made a quick check on the Alloman-Ferrero. I have worked on this, and this brings in the Flutie exception, and that's where your case, I think, is absolutely different than any of the others. I don't know. But between Flutie and Alloman and your case, as I said, I get a lot of confusion. And you're right. I think she would have been paroled in. I mean, all of our cases on exclusion, everybody's been paroled in. In fact, the problem is they get lost, and so three years later, four years, they find them. That's why we have the problems is because they're paroled in, and that's another one of the brilliant parts of the INS problem. Right. Well, in my reply brief, I tried to distinguish a little bit Alloman-Ferrero, so I won't go over that again. But I think you're right, Your Honor. I think what's different from this case and Aguilera-Ruiz is the equal protection argument that's raised in this case. They just did a Flutie application there. Flutie, and they argued also that, you know, as I'm arguing here, that the regulation 3.4 is not authorized by statute. Yeah. But they didn't get into the equal you. I think you're in your position as argued to the Court is a little different. I believe it is, Your Honor. And I'll submit it on that unless the Court has any questions. All right. Thank you very much. Thank you. The matter will stand submitted. And we come to Velazmaro v. Ashcroft. Good morning, Your Honors. Vadim Zapolsky, attorney for Petitioner, Gerardo Rappel, Velazmaro.
judges: B. Fletcher, Pregerson, Brunetti